# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

KIMBERLY MITCHELL, as Personal Representative
of the Estate of TIMOTHY JASON COFFMAN, Deceased,

       Plaintiff,                            Case No.: 6:20-cv-1084-Orl-41LRH

vs.

CITY OF SOUTH DAYTONA,
CHIEF MARK CHEATHAM, in his official capacity as Chief of Police;
OFFICER DAVID MCCALLISTER, in his individual capacity;
OFFICER TAYLOR SANDERSON, in her individual capacity;
OFFICER CLAY TREAT, in his individual capacity; and
SERGEANT BRYAN CRAIG, in his individual capacity.

       Defendants.

_____/

## PLAINTIFF'S THIRD AMENDED COMPLAINT

**COMES NOW**, Plaintiff **KIMBERLY MITCHELL** ("MITCHELL"), as

Personal Representative of the Estate of **TIMOTHY JASON COFFMAN**

("COFFMAN") deceased, and hereby files this Third Amended Complaint, as

authorized by this Court (Doc. 60), by and through the undersigned counsel, against

the above-named Defendants **CITY OF SOUTH DAYTONA** ("CITY"); **CHIEF**

**MARK CHEATHAM** ("CHEATHAM") in his official capacity as Chief of Police;

**OFFICER DAVID MCCALLISTER** ("MCCALLISTER"), in his individual

capacity; **OFFICER TAYLOR SANDERSON**, ("SANDERSON") in her

individual capacity; **OFFICER CLAY TREAT** ("TREAT"), in his individual

capacity; and **SERGEANT BRIAN CRAIG** ("CRAIG"), in his individual capacity; for causing the death of **TIMOTHY JASON COFFMAN** ("COFFMAN" or "Decedent"), on July 2, 2018, for which Plaintiff now seeks damages, and in support thereof alleges as follows:

## VENUE, JURISDICTION, AND PARTIES

1.     This action was originally brought for wrongful death pursuant to Florida's Wrongful Death Statute § 768.21, and United States Constitution Amendment IV, 42 U.S.C. § 1983. Plaintiff MITCHELL has complied with all conditions precedent set forth by the State of Florida pursuant to Florida Statute 768.28. The Third Amended Complaint repleads the claim against the CITY and CHIEF CHEATHAM for having violated Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §12132 ("ADA") by failing to protect COFFMAN'S federally guaranteed right to be free from discrimination on the basis of disability by their willful failure to make reasonable modifications to their policies, practices and procedures to ensure his needs as an individual with a disability would be met.

2.     Venue is proper in the Middle District of Florida based upon 28 U.S.C. § 1391 (b), as all Defendants are residents of this District and the acts or occurrence giving rise to these claims occurred in this District.

3.     Defendant CITY was and is a municipality and/or political subdivision of the State of Florida located in South Daytona, Florida. Defendant CITY was at all

times material hereto, operating and conducting business in South Daytona, Florida, which includes but is not limited to: supervising and being responsible for the actions and omissions of its agents and employees and includes but it not limited to: managing, supervising, and overseeing the SOUTH DAYTONA POLICE DEPARTMENT ("SDPD"), including establishing policies and training regarding the performance of their officers' conduct consistent with the United States Constitution, the ADA, as well as Florida statutes and common law.

4.     The CITY, through SDPD, is operating and conducting business in the city of South Daytona, Volusia County, Florida, and employs Defendant CHIEF CHEATHAM, Defendant MCCALLISTER, Defendant SANDERSON, Defendant TREAT and Defendant CRAIG. As such, Defendant CHEATHAM, in his official capacity as the current Chief of SDPD, is ultimately liable for his officers' actions and inactions that result in injury to citizens and any discriminatory acts of his agency.

5.     Defendant CHEATHAM was a resident of Volusia County, Florida, at the time of the incident.

6.     Defendant MCCALLISTER was a resident of Volusia County, Florida, at the time of the incident.

7.     Defendant SANDERSON was a resident of Volusia County, Florida, at the time of the incident.

8.     Defendant TREAT was a resident of Volusia County, Florida, at the time of the incident.

9.     Defendant CRAIG was a resident of Volusia County, Florida, at the time of the incident.

10.     Decedent COFFMAN was a resident of Volusia County, Florida, at the time of the subject incident.

11.     Plaintiff MITCHELL is the natural mother and Personal Representative of the Estate of TIMOTHY JASON COFFMAN, and is a resident of Florida, at all times material to the subject incident and as of today's date.

12.     All of the acts or omissions giving rise to this action occurred in the City of South Daytona, Volusia County, Florida.

13.     This is an action seeking damages in excess of seventy-five thousand dollars ($75,000.00), exclusive of costs, interest, and attorney's fees.

## FACTUAL ALLEGATIONS

14.     Decedent COFFMAN was a mentally ill, 36-year-old man who died on July 2, 2018 as a result of being asphyxiated by MCCALLISTER, SANDERSON, CLAY TREAT and CRAIG during an encounter with Defendant Officers on June 28, 2018.

15.     On June 28, 2018, at approximately 7:00 A.M., Decedent COFFMAN was walking around his neighborhood with a female companion. During this time, a

911 call was placed to the Port Orange Police Department reporting a man who "seemed off," which led to a dispatch of the Defendant Officers, starting with TREAT arriving first at the location.

16.   Decedent COFFMAN had a long history of mental illness including bipolar and schizophrenia, that was first diagnosed in his childhood, of which both the CITY and CHEATHAM were fully aware.

17.   The CITY and CHEATHAM were also fully aware that COFFMAN had been previously Baker Acted by law enforcement, including SDPD.

18.   Upon TREAT's arrival on the scene, he was made aware of COFFMAN and was informed that COFFMAN was mentally ill.

19.   COFFMAN was clearly and obviously in a state of psychosis and afraid of law enforcement, along with an altered mental state due to being under the influence of methamphetamine.

20.   COFFMAN, under psychosis, upon being confronted by TREAT took off running in the opposite direction from TREAT, shouting for help, as he believed he was being pursued by "false police" or "fake police."

21.   Defendant TREAT immediately and aggressively pursued COFFMAN and unleashed a taser, causing COFFMAN to fall to the ground. COFFMAN pulled the taser leads from his person, got up and continued running away from TREAT, in fear for his life. TREAT continued chasing behind COFFMAN, extracted his SDPD

issued pepper spray, pointed it at COFFMAN and sprayed him; however, because COFFMAN was in the midst of an active and obvious psychotic episode, COFFMAN picked up a common handheld garden spray bottle in an attempt to keep TREAT from inflicting him with more pain.

22.     In response, TREAT, removed his baton and struck COFFMAN with his baton and shocked COFFMAN again. COFFMAN ran onto the porch of a home located at 2406 Citrus Avenue, owned by Tommy Pendleton, where COFFMAN pleaded and yelled: "Help me, help me!"

23.     Shortly thereafter, MCCALLISTER, CRAIG, and SANDERSON arrived at 2406 Citrus Avenue where COFFMAN and TREAT were then located.

24.     At this time, MCCALLISTER, CRAIG, SANDERSON and TREAT, tackled COFFMAN and placed him in a prone position, restraining him and turning COFFMAN onto his stomach and face into the solid ground with his nose and mouth face down.

25.     The four Officers secured COFFMAN'S body. They placed COFFMAN'S hands behind him to be handcuffed, while two officers secured his legs with restraints. While doing so, MCCALISTER then placed both knees on the back of COFFMAN'S neck and planted him facedown with both of their full weight bearing into the ground, compromising COFFMAN'S ability to breathe.

26.   After securing COFFMAN, despite knowingly and purposefully compromising COFFMAN'S ability to breathe, Defendants MCCALLISTER, CRAIG, SANDERSON and TREAT, held COFFMAN in place while MCCALISTER exerted his full body weight onto to his neck, obstructing his airway for over four minutes, until he lost consciousness and sustained positional asphyxia which ultimately caused his death.

27.   More specifically, at approximately 7:12 A.M., Defendants MCCALLISTER, CRAIG, SANDERSON and TREAT slammed COFFMAN to the ground, placed their body weight into COFFMAN's neck, back and legs; placed him in handcuffs and tied him at the ankles. Once COFFMAN was completely subdued and posed no threat to anyone, the Defendants remained on top of COFFMAN'S body, while MCCALISTER'S knees continued to press into COFFMAN'S neck and back for approximately four (4) minutes.  In fact, after turning COFFMAN onto his back with his hands behind him in cuffs, CRAIG says to TREAT, "Clay, go relax; we got this, we're good". Nonetheless, MCCALLISTER remained on COFFMAN'S neck.

28.   Despite seeing COFFMAN in actual physical distress and losing consciousness, MCCALLISTER remained on his neck for more than four minutes. Notwithstanding observing this, CRAIG, SANDERSON and TREAT failed to intervene and remove MCCALLISTER from COFFMAN.

29.     At or around 7:16 A.M., after bearing the weight of the four Defendants on his back, neck, and legs while having his face smothered into the grass, COFFMAN became unconscious as evidenced by the body camera footage. At that point Defendants attempted to ask COFFMAN questions, but he was unresponsive and motionless. Defendants then turned COFFMAN onto his side, still handcuffed and tied at the ankles.  There exists body camera footage showing COFFMAN'S face had turned blue and it was obvious that he was clearly hypoxic. Defendants can be heard in the body camera footage, telling COFFMAN: "Come on bud, stay with me. Stay with me!" At this point, none of the Defendants attempted to perform CPR, apply a defibrillator, or use any resuscitative measures, and/or life saving measures, despite knowing he was experiencing a medical emergency and/or dying.

30.     On or around 7:19 A.M., Defendants attempted to administer Narcan, but after no response to the first dose, Defendants then waited another two (2) minutes before administering a second round of Narcan, which was also unsuccessful. Body camera footage shows the officers standing around COFFMAN'S body, who was still handcuffed and in a prone position, failing to remove the physical restraints, failing to attempt CPR, use a defibrillator, use any resuscitative measures, and/or life saving measures. As a direct and proximate cause of  MCCALLISTER, CRAIG, SANDERSON and TREAT's actions and omissions,

the veins in COFFMAN'S arms became vascular, his face and body became red, then blue, and he began to foam at the mouth.

31.  At approximately 7:25 A.M., MCCALLISTER, CRAIG, SANDERSON and TREAT attempted to roll COFFMAN over and have him sit upright on the grass, and now along with his face, COFFMAN'S legs have also turned blue and vascular, showing clear and obvious signs of oxygen deprivation. By this time, COFFMAN has been unconscious for approximately ten (10) minutes and the officers failed to perform CPR or use a defibrillator or perform any resuscitative measures.

32.  Defendants MCCALLISTER, CRAIG, SANDERSON and TREAT were aware that COFFMAN was still alive but hypoxic and at risk of imminent permanent injury and/or death. At approximately 7:26 A.M., South Daytona EMT arrived on the scene, and one of the officers can be heard telling the responding EMT paramedic "he's going downhill quick man," clearly demonstrating actual knowledge he was facing imminent death, as he had been unconscious for over ten (10) minutes.

33.  COFFMAN was released from handcuffs approximately one minute before EMT arrived, and Defendants only began performing CPR approximately 20-30 seconds before the EMT paramedic arrived. This was likely at the time in which they heard sirens so that EMT would arrive and see them performing CPR. Despite

receiving the CPR from the responding EMT, COFFMAN was still not breathing on his own and had no gag reflex when the laryngoscope blade was inserted. COFFMAN was also found hypotensive and with dilated pupils.

34.     COFFMAN was transported to Halifax Health Medical Center, where it was noted per the emergency department records, COFFMAN was running *from* the police, was shocked twice, and tasered prior to COFFMAN collapsing to the ground and being found by EMT asystole, a usual a sign of irreversible cardiac arrest.

35.     Once COFFMAN arrived at Halifax Health Medical Center, he was placed on life support suffering from multiorgan failure, anoxic brain injury, encephalopathy, acute renal failure, thrombocytopenia, severe rhabdomyolysis, severe lactic acidosis, coagulopathy and multiple electrolyte derangements.

36.     COFFMAN never regained consciousness and was pronounced dead on July 2, 2018, when he was disconnected from a ventilator.

37.     COFFMAN'S autopsy took place on July 3, 2018, and Jon R. Thogmartin, Chief Medical Examiner noted the following: Manner of Death: Homicide; Contributory Condition: Physical Restraint.

38.     At all times material hereto, COFFMAN was known to surrounding police departments as being a person that suffered with mental illness, drug addiction, and had been Baker Acted on multiple occasions. In fact, the CAD

message report received from SDPD pursuant to Plaintiff's Public Record Request, Operator Philip Brashier asks CRAIG "Is the suspect Timothy Jason Coffman?" which CRAIG responds, "yes sir."

39.     In fact, Defendant CRAIG noted in his Memorandum that it was "clearly evident that the suspect [Timothy Coffman] was under the influence of narcotics." SDPD's employees therefore knew or should have known that COFFMAN'S behavior was due to his mental illness and drug abuse, and not an individual committing a crime requiring the level of force utilized by the SDPD officers on the date of the incident.

40.     COFFMAN was under the influence of drugs and suffering from a psychotic episode due to mental illness when he was killed by MCCALLISTER, CRAIG, SANDERSON and TREAT of the SDPD.

41.     At all times material hereto, MCCALLISTER, CRAIG, SANDERSON and TREAT were all agents and/or employees of the CITY, and at all times material hereto, CHIEF  CHEATHAM was their immediate superior/supervisor.

42.     Therefore, MCCALLISTER, CRAIG, SANDERSON and TREAT, the CITY, and CHIEF CHEATHAM'S collective and individual failures, actions, and inactions proximately caused the violations of COFFMAN'S civil and constitutional rights which resulted in his homicide.

43.     SDPD failed to conduct any appropriate investigation into the death of COFFMAN, despite clear video evidence of deadly force being used on COFFMAN, which was completely and entirely omitted in every internal document prepared by each of the present officers, as well as each senior reviewing officer. These documents were then forwarded to the State Attorney's office without the video evidence. SDPD's pattern and practice and/or custom and policy of the use of excessive force and cover-up led to the violations of COFFMAN's constitutional rights that caused his untimely death.

44.     SDPD attempted to justify and cover-up the constitutional violations resulting in the death of COFFMAN and failed to discipline the deputies involved, thereby ratifying their misconduct and unconstitutional behavior. COFFMAN was running away from the Defendant TREAT, while suffering a psychotic episode, and was unnecessarily tasered, pepper sprayed, tasered once more, and finally, taken down to the ground with his face in the grass while the Defendants exerted their entire body weight onto COFFMAN'S neck and back, while his hands and legs were restrained, causing him to suffocate.

45.     Defendants MCCALLISTER, CRAIG, SANDERSON and TREAT had not been properly trained in the use of force, de-escalation techniques, non-lethal uses of force, or non-lethal uses of force when dealing with those who are mentally ill, and especially those suffering psychotic breaks. Defendants MCCALLISTER,

CRAIG, SANDERSON and TREAT were not properly supervised nor disciplined by SDPD and/or CHIEF CHEATHAM.

46.     Defendant CHIEF CHEATHAM and SDPD have a pattern and practice and/or custom of violating citizens clearly established constitutional right to be free from excessive force, rights to due process of law, and substantive due process rights, pursuant to the Fourth and Fourteenth Amendment of the United States Constitution.

47.     Defendants' individual and collective actions and omissions actually and proximately caused the death of COFFMAN. Plaintiff and the Estate of TIMOTHY COFFMAN, are entitled to damages pursuant to Florida's Wrongful Death Act and the Fourth and Fourteenth Amendments to the Constitution of the United States of America, for the value of Decedent's life and the value of his loss, including but not limited to the following:

a.  Award compensatory and any applicable punitive damages to Plaintiff;
b.  Award costs of this action to Plaintiff;
c.  Award reasonable attorneys' fees and costs to Plaintiff on Federal 1983 Counts pursuant to 42 U.S.C. §1988;
d.  Loss of past and future support and services with interest;
e.  Loss of earnings and net accumulations to the Estate of Timothy Coffman;
f.  Any and all medical and/or funeral expenses incurred due to the wrongful death of the Decedent;

g.  Loss to Plaintiff of familial relationship with decedent, companionship, comfort, support, society, care and sustenance of decedent, and the mental pain and suffering form the past date of injury through the future, compensation for medical bills as a result of psychological and physical injury, as a result of Timothy Coffman's death;

h.  Any and all other and further relief as this Court may deem appropriate.

## <u>COUNT I</u>
## <u>EXCESSIVE FORCE BY MCCALLISTER;  42 U.S.C. § 1983</u>

48.    Plaintiff hereby incorporates paragraphs 1, 6, 19, 24-42, and 47 as though fully set forth herein.

49.    Plaintiff brings this claim under 42 USC § 1983 for violation of the Fourth and Fourteenth Amendment of the U.S. Constitution.

50.    MCCALLISTER at all times was "acting under color of State Law".

51.    MCCALLISTER'S actions were intentional and in violation of clearly established law.

52.    MCCALLISTER'S use of force was excessive in placing both knees on the neck of COFFMAN, depriving him of oxygen, for more than four minutes after he was placed on his stomach and secured in such a way to pose no threat of harm to anyone.

53.    MCCALLISTER'S actions proximately caused and/or contributed to the death of COFFMAN, depriving him of his constitutional rights.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and damages listed in paragraph 47.

## COUNT II
## DUTY TO INTERVENE AGAINST SANDERSON; 42 U.S.C § 1983

54.     Plaintiff hereby incorporates paragraphs 1, 7, 19, 24-42, and 47 as though fully set forth herein.

55.     Plaintiff brings this claim under 42 USC § 1983 for violation of the Fourth and Fourteenth Amendment of the U.S. Constitution.

56.     MCCALLISTER'S use of force against the Plaintiff was excessive.

57.     SANDERSON had a duty to intervene and protect COFFMAN from excessive force but failed to do so in violation of established law: *Putman v. Gerloff,* 639 F.2d 415 (8th Cir. 1981).

58.     SANDERSON'S actions were intentional and proximately caused and/or contributed to the death of COFFMAN, depriving him of his constitutional rights.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and damages listed in paragraph 47.

## COUNT III
## DUTY TO INTERVENE AGAINST TREAT; 42 U.S.C. § 1983

59.     Plaintiff hereby incorporates paragraphs 1, 8, 18-22, 24-42 and 47 as though fully set forth herein.

60.     Plaintiff brings this claim under 42 USC § 1983 for violation of the Fourth and Fourteenth Amendment of the U.S. Constitution.

61.     MCCALLISTER'S use of force against COFFMAN was excessive.

62.     TREAT had a duty to intervene and protect COFFMAN from excessive force but intentionally failed to do so in violation of clearly established law: *Putman v. Gerloff,* 639 F.2d 415 (8th Cir. 1981).

63.     TREAT'S actions were intentional and proximately caused and/or contributed to the death of COFFMAN, depriving him of his constitutional rights.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and damages listed in paragraph 47.

## COUNT IV
## DUTY TO INTERVENE AGAINST CRAIG; 42 U.S.C. § 1983

64.     Plaintiff hereby incorporates paragraphs 1, 9, 19, 24-42, and 47 as though fully set forth herein.

65.     Plaintiff brings this claim under 42 USC § 1983 for violation of the Fourth and Fourteenth Amendment of the U.S. Constitution.

66.     MCCALLISTER'S use of force against the Plaintiff was excessive.

67.     CRAIG had a duty to intervene and protect COFFMAN from excessive force but failed to do so in violation of *Putman v. Gerloff,* 639 F.2d 415 (8th Cir. 1981).

68.     CRAIG'S actions were intentional and proximately caused and/or contributed to the death of COFFMAN, depriving him of his constitutional rights.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and damages listed in paragraph 47.

## COUNT V
## CONSPIRACY TO VIOLATE DECEDENT'S CIVIL RIGHTS BY MCCALISTER, SANDERSON, TREAT, AND CRAIG; 42 U.S.C. § 1983

69.     Plaintiff hereby incorporates paragraphs 1, 6-9, 24-31, and 47 as though fully set forth herein.

70.     Defendants MCCALISTER, SANDERSON, TREAT, and CRAIG, each did combine and agree to conspire to violate Decedent's civil rights under 42 USC §1983.

71.     The following overt acts were committed in furtherance of the conspiracy:   a) MCCALLISTER used excessive force in causing the death of COFFMAN and SANDERSON, TREAT, and CRAIG failed to intervene and protect him; b) MCCALISTER, SANDERSON, TREAT, and CRAIG each knowingly omitted the critical fact that MCCALISTER had both knees pressed on the back of

COFFMAN'S neck in excess of four minutes while his nose and mouth were facedown into the ground from their respective police reports, and thereby omitted critical information in creating untrue police reports; and (c) no one told the EMT that they had compromised COFFMAN'S airway.

72.     As a result of the conspiracy, the Plaintiff sustained injuries.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and damages listed in paragraph 47.

## COUNT VI
## FAILURE TO PROPERLY TRAIN, SUPERVISE AND CONTROL OFFICERS BY CHIEF CHEATHAM (In his official capacity); 42 U.S.C. § 1983 VIOLATION

73.     Plaintiff hereby incorporates paragraphs 1, 17, 21, and 24-47 as though fully set forth herein.

74.     Plaintiff brings this claim under 42 USC § 1983 for violation of the Fourth and Fourteenth Amendment of the U.S. Constitution

75.     At all times material hereto, MCCALLISTER, SANDERSON, TREAT and CRAIG were employees and/or agents of CITY and acting within the course and scope of their employment with same, in furtherance of the interest of and with CHIEF CHEATHAM consent.

76.     As such, CITY and CHIEF CHEATHAM by and through SDPD are liable for all of its employees and/or agents' acts and omissions that gave rise to this

action, including the actions and inactions of MCCALLISTER, SANDERSON, TREAT and CRAIG, since CITY along with CHIEF CHEATHAM act as final policy makers.

77.     CITY and CHIEF CHEATHAM, by and through its employees and agents, owed a duty to COFFMAN, to establish proper policies, customs, and usages of its police department and to train, supervise, and control said officers. CHIEF CHEATHAM owed a legal duty to supervise SDPD officers, discipline said officers and retrain said officers on policies and customs of engaging mental ill suspects and avoiding unnecessary use of deadly force in effecting arrest.

78.     Upon information and belief prior to the death of COFFMAN, CITY and CHIEF CHEATHAM had a custom and usage of failing to properly train, retrain, supervise, and discipline officers including MCCALLISTER, SANDERSON, TREAT and CRAIG on the use of excessive force and deadly force. This includes de-escalation techniques and use of non-lethal force techniques despite having actual knowledge of the need to do so based upon the evolving use of force in policing, but the CITY and CHIEF CHEATHAM failed to do so.

79.     Specifically, on July 6, 2018, CHIEF CHEATHAM[1] and then acting CHIEF MONAHAN, JR., concluded in their Use of Force Review, "A review of the

---

[1] At the time of the SDPD Use of Force Review, signed July 6, 2018, , now Chief Cheatham, was then Captain Cheatham.

incident along with the body camera footage confirms the amount of force utilized was the appropriate force under the circumstances and within Department policy." This amounts to "Ratification" of the Defendant officers' use of excessive force in violation of clearly established law.

80.    CHIEF CHEATHAM and CITY failed to adequately train, supervise, and properly control the Defendant police officers who unlawfully and unconstitutionally used excessive force against COFFMAN in an attempt to arrest him. In addition, specifically, CHIEF CHEATHAM failed to properly train CRAIG, who was a sergeant with authority over MCCALLISTER, on what actions to take when a fellow officer was engaged in using excessive force in arresting a suspect.

81.    CHIEF CHEATHAM and CITY, despite having actual knowledge of the necessity to train officers when engaging suspects in psychosis, in order to de-escalate the encounter, failed to provide said training.

82.    CHIEF CHEATHAM failed to train officers that "choke-holds" or placing knee(s) on an individual's neck or back for an extended period of time is a deadly use of force, despite having prior knowledge of usage of such techniques, which would and did amount to the unjustified use of force.

83.    Defendants MCCALLISTER, SANDERSON, TREAT and CRAIG were not subject to any discipline or any additional training as a result of their use of excessive force including their misconduct during the instant incident. The

aforementioned failures amounted to violations of non-discretionary duties which Defendants CITY and CHIEF CHEATHAM owed to citizens of South Daytona including Decedent, COFFMAN. As such, Defendants CITY and CHIEF CHEATHAM breached duties including their ministerial duties owed to Decedent.

84.   CITY and CHIEF CHEATHAM ratified the usage and custom of administering this deadly force technique which was a violation of COFFMAN'S constitutional rights. A complete omission of the technique of deadly force used on COFFMAN from any report, filed by MCCALLISTER, SANDERSON, TREAT and CRAIG, is evidence of ratification through a lack of training, supervision and control.

85.   Defendants CITY and CHIEF CHEATHAM'S failure to reprimand, intervene and/or take corrective action with its officers is evidence that those Defendants ratified and endorsed the level of force used here as a matter of standard policy.  This provides evidence of their breach of the duties owed to the citizens of South Daytona including Decedent COFFMAN.

86.   CITY AND CHIEF CHEATHAM failed to effectuate any training program where officers are instructed in techniques and methods of stopping fellow officers when engaging in the use of excessive force.

87.   CITY and CHIEF CHEATHAM knew or should have known of the dangers posed by failing to properly train, control and supervise its officers, and that

said actions and inactions were likely to result in violations of citizens' rights, and as such were reasonably foreseeable.

88.    CITY and CHIEF CHEATHAM'S actions and omissions breached the duties owed to Decedent and Plaintiff, and actually and proximately caused the death of COFFMAN.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and damages listed in paragraph 47.

## COUNT VII
## FAILURE TO PROPERLY TRAIN, SUPERVISE AND CONTROL OFFICERS BY THE CITY; 42 U.S.C. § 1983 VIOLATION

89.    Plaintiff hereby incorporates paragraphs 1, 17, 21, and 24-47 as though fully set forth herein.

90.    Plaintiff brings this claim under 42 USC §1983 for violation of the Fourth and Fourteenth Amendment of the U.S. Constitution.

91.    At all times material hereto, MCCALLISTER, SANDERSON, TREAT and CRAIG were employees and/or agents of CITY and acting within the course and scope of their employment with same, in furtherance of the interest of and with CITY's consent.

92.    As such, CITY by and through SDPD are liable for all of its employees and/or agents' acts and omissions that gave rise to this action, including the actions

and inactions of MCCALLISTER, SANDERSON, TREAT and CRAIG, since CITY along with CHIEF CHEATHAM act as final policy makers.

93.   CITY by and through its employees and agents, owed a duty to COFFMAN, to establish proper policies, customs, and usages of its police department and to train, supervise, and control said officers. CITY owed a legal duty to supervise SDPD officers, discipline said officers and retrain said officers on policies and customs of engaging mental ill suspects and avoiding unnecessary use of deadly force in effecting arrest.

94.   Upon information and belief prior to the death of COFFMAN, CITY had a custom and usage of failing to properly train, retrain, supervise, and discipline officers including MCCALLISTER, SANDERSON, TREAT and CRAIG on the use of excessive force. This included de-escalation techniques and use of non-lethal force techniques; despite having actual knowledge of the need to do so and based upon evolving use of force policing but the CITY failed to do so.

95.   CITY failed to adequately train, supervise, and properly control the Defendant police officers who unlawfully and unconstitutionally used excessive force against COFFMAN, in an attempt to arrest him. In addition, specifically, CITY failed to properly train CRAIG, who was a sergeant with authority over MCCALLISTER, on what actions to take when a fellow officer was engaging in the use of excessive force in arresting a suspect.

96.     CITY, despite having actual knowledge of the necessity to train officers when engaging suspects in psychosis in order to de-escalate encounter, failed to provide said training.

97.     CITY failed to train officers that "choke-holds" or placing knee(s) on an individual's neck or back for an extended period of time is a deadly use of force, despite having prior knowledge and usage of such techniques, which would and did amount to the unjustified use of force.

98.     Defendants MCCALLISTER, SANDERSON, TREAT and CRAIG were not subject to any discipline or any additional training as a result of their use of excessive force including their misconduct for the instant incident. The aforementioned failures amounted to violations of non-discretionary duties Defendant CITY owed to citizens of South Daytona including Decedent, COFFMAN. As such Defendants breached duties including ministerial duties owed to Decedent.

99.     CITY ratified the usage and custom of administering this deadly force technique which was a violation of COFFMAN'S constitutional rights.  A complete omission of the technique of deadly force used on COFFMAN from any report, filed by MCCALLISTER, SANDERSON, TREAT and CRAIG is evidence of ratification through a lack of training, supervision and control.

100.   Defendants CITY and CHIEF CHEATHAM'S failure to reprimand, intervene and/or take corrective action with its officers is evidence that Defendants ratified and encouraged the level of force used here as a matter of standard policy. This provides evidence of their breach of the duties owed to the citizens of South Daytona including Decedent COFFMAN.

101.   CITY AND CHIEF CHEATHAM failed to effectuate any training program where officers are instructed in techniques and methods of stopping fellow officers when engaging in the use of excessive force.

102.   CITY and CHIEF CHEATHAM knew or should have known of the dangers posed by failing to properly train, control and supervise its officers, and that said actions and inactions were likely to result in violations of citizens' rights, and as such were reasonably foreseeable.

103.   CITY and CHIEF CHEATHAM'S actions and omissions breached the duties owed to Decedent and Plaintiff, and actually and proximately caused the death of COFFMAN.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and damages listed in paragraph 47.

## COUNT VIII
## WRONGFUL DEATH ACTION AGAINST CITY

104.   Plaintiff hereby incorporates paragraphs 1, 6, 24-31, 36-47 as though fully set forth herein.

105.   This is an action brought against CITY, pursuant to the Florida Wrongful Death Act, Florida Statute §768.16-768.26, for negligence.  All conditions precedent have been satisfied and/or waived.

106.   On June 28, 2018, at approximately 7:16 AM, COFFMAN was restrained by four officers employed by CITY and CHIEF CHEATHAM, when MCCALLISTER positioned himself on the back of COFFMAN'S neck, shutting off his airway for in excess of four minutes causing his death.

107.   At the said time and place, COFFMAN posed no threat to anyone, and MCCALLISTER was performing conduct and actions on behalf of CHIEF CHEATHAM and the CITY.

108.   At all times MCCALLISTER had a duty to use reasonable care, so not to endanger the life of persons, including COFFMAN.

109.   MCCALLISTER breached said to duty to use reasonable care.

110.   COFFMAN died as a proximate cause and result of said breach.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and all damages contained in paragraph 47.

## COUNT IX
## WRONGFUL DEATH ACTION AGAINST CHIEF CHEATHAM
### (In his official capacity)

111.   Plaintiff hereby incorporates paragraphs 1, 6, 24-42, and 47 as though fully set forth herein.

112.   This is an action brought against Chief Cheatham, pursuant to the Florida Wrongful Death Act, Florida Statute §768.16-768.26, for negligence. All conditions precedent have been satisfied and/or waived.

113.   On June 28, 2018, at approximately 7:16 AM, COFFMAN was restrained by four officers employed by CITY and CHIEF CHEATHAM, when MCCALLISTER positioned himself on the back of COFFMAN'S neck, shutting off his airway for in excess of four minutes causing his death.

114.   At the said time and place, COFFMAN posed no threat to anyone, and MCCALLISTER was performing conduct and actions on behalf of CHIEF CHEATHAM and the CITY.

115.   At all times MCCALLISTER had a duty to use reasonable care, so not to endanger the life of persons, including COFFMAN.

116.   MCCALLISTER breached said to duty to use reasonable care.

117.   COFFMAN died as a proximate cause and result of said breach.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), together with post judgment interest and costs and all damages contained in paragraph 47.

**COUNT X**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT AGAINST THE CITY**

118. Plaintiff hereby incorporates by reference paragraphs 1-4, 11-47, and 74-88 as though fully set forth herein.

119.  COFFMAN had a protracted and widely known history of mental illness within the  CITY and throughout Volusia County, Florida. On July 22, 2021, a deposition was taken by defense counsel of Plaintiff KIMBERLY MITCHELL, Decedent's mother. MITCHELL, who is currently on disability because of medical reasons, had earned a bachelor's degree in business and finance at UCF and held professional licenses as a commercial insurance broker and a real estate broker. She is a widow and had a close personal relationship with her son up through the time of his death on July 2, 2018.

120.   MITCHELL provided a detailed history of her son's deep seated psychiatric problems and related drug abuse disorders. She stated that her son had been either Baker-acted or Marchman-acted between 15 and 20 times, all of which occurred in Volusia County. The first time he was subject to the Baker act was in or about 1995-96, when he was approximately 14 years old, according to Plaintiff's

testimony. She testified that he was committed at that time to Halifax Behavioral facility as a result of proceedings commenced by his then therapist, a woman named Wendy LNU of the Florida Health Care Psychiatry, as a result of his behavior having become "erratic and uncontrollable." According to Plaintiff, her son was mostly a threat to himself and not other people. She never feared him. She testified that "there wasn't any violence towards anyone. It was more you could tell psychologically that he was out of his mind… . It wasn't that he was violent. It was almost the opposite. He was more like an injured animal."

121. Plaintiff further testified that her son was diagnosed as suffering from severe ADHD in the sixth grade and later diagnosed as being bipolar in or about 1999. Bipolar disorder is associated with a higher than normal rate of suicide and infliction of self-harm. In her deposition, Plaintiff testified that her son often expressed suicidal ideations and at times was extremely paranoid. As an example, she stated that her son had nailed shut all access to their attic, fearing that there were people living in the attic. Challenging him on this type of assertion, her son would explain that he had heard that there had been some problems in a neighbor's attic with strangers, none of which of course was true.

122. During the deposition, defense counsel showed Plaintiff a Report of Law Enforcement Officer Initiating Involuntary Examination involving Police Officer Brian Walsh of the South Daytona Police Department, dated August 13, 2014.

Officer Walsh wrote that the "subject [COFFMAN] was at his residence talking to walls and cabinets …[and] stated to Kimberly Mitchell he was just going to overdose and he did not want to live." In response to a direct question by defense counsel, Plaintiff testified that she believed that the 2014 Baker application, which the South Daytona Police Department had initiated, involved "real suicidal ideation" by her son. She testified that the Baker act was really nothing more than a very frustrating revolving door which provided very little relief to her son and only further entangled him within the criminal justice system.

123.   The individual Defendant officers were deposed subsequent to the filings of the Second Amended Complaint (SAC) (Doc. 52), the Municipal Defendants' Partial Motion to Dismiss ADA Counts X and XI of the SAC (Doc. 54) and Plaintiff's Response (Doc. 55). Each of the Defendant officers testified in deposition that they could not recall being given training in dealing with mentally impaired individuals or de-escalation techniques prior to the strangulation death of COFFMAN on June 28, 2018 and knew of no crisis intervention team sponsored by or available to SDPD even *after* the death of COFFMAN through the present.

124. According to the testimony offered in deposition by the Defendant officers, there was virtually no in-depth, follow up investigation by superior officers as to the events in question. Nor were there any subsequent efforts by the Municipal Defendants in the last three years since COFFMAN's death in 2018 to take positive

corrective action to avoid a duplication of that avoidable tragedy. These events by themselves suggest a deliberate indifference by decision makers for both the City and SDPD regarding ADA compliance.

125. Ironically enough, Defendant  MCCALLISTER, who admitted that his knees were on the back of COFFMAN even after he was fully handcuffed with leg restraints while he was in the prone position - thereby compromising his ability to breathe - never received *any* de-escalation or crisis intervention training when he was employed at SDPD *but received that very same training* when he left the employ of the SDPD in January 2020 and joined the New Smyrna Police Department. That factor alone underscores the discriminatory practices by the CITY and SDPD which are forbidden by the ADA.

126.  The Florida Crisis Intervention Team (CIT) Program began in 2004 and was adopted in Florida on March 18, 2005. The Florida CIT Program is modeled after the Crisis Intervention Team which began in Memphis, Tennessee in the late 1980s and has been widely adopted around the country. In its literature, the Florida CIT Program states its mission is to create "an effective police response program designed for first responders who handle crisis calls involving people with mental illness including those with co-occurring substance use disorders. CIT emphasizes a partnership between law-enforcement, the mental health and substance abuse treatment system, mental health advocacy groups and consumers of mental health

services and their families." *See Florida CIT Program*, p. 2 (2005). The Florida CIT program utilizes general training for all police officers and then the designation of CIT officers who have a heightened suitability for the position and full knowledge of the program. *Id.* at 4. It has been adopted by many Police Departments and Sheriff's Offices in the Middle District of Florida, including, among others, the Altamonte Springs Police Department, Brevard County Sheriff's Office, Daytona Beach Police Department, Hillsboro County Sheriff's Office, Jacksonville Sheriff's Office, Ocala Police Department, Orange County Sheriff's Office, Orlando Police Department, Sarasota Police Department, Seminole County Sheriff's Office, St. Petersburg Police Department, Volusia County Sheriff's Office and Winter Park Police Department.

127.   The CIT program has dramatically reduced the number of arrests of mentally disabled individuals nationwide, including an estimated arrest reduction of the mentally impaired by 95% in 2017 for the 36 local police departments in Miami-Dade County, Florida. Approximately 2800 CIT programs operate across the country. *See* Paras V. Shah, *A Use of Deadly Force: People with Mental Health Conditions and Encounters with Law Enforcement*, 32 Harvard Human Rights Journal 207, 218-19 (2019) (internal citations omitted). Without question, these types of de-escalation and CIT programs not only reduced the need to make arrests,

but also avoided the incidental use of deadly physical force upon mentally disturbed individuals who otherwise can be safely managed.

128.  Notwithstanding the long-standing success of the CIT programs all across Florida and nationwide since at least 2005, the CITY and SDPD consciously and willfully failed to institute a crisis intervention team at any relevant time in the ensuing 16 years, including through the present time. The abject failure of CITY and SDPD high ranking officials to comply with their ADA requirements is manifest, despite their knowledge of the success of the CIT program in virtually every major police department and sheriff's office in the Middle District of Florida.

129.  It was obvious from the unfolding of events on June 28, 2018 that COFFMAN was mentally disturbed, as recognized by Defendant TREAT and innocent bystanders. He had already been Baker acted by the SDPD in 2014 for hallucinatory and paranoid thoughts, "hearing voices, running around frantically... [and] looking under bed."  He had many encounters through numerous Baker acts/Marchman acts with SDPD, by the mere location of where he lived, according to Kim Mitchell.

130.  His behavior on the day in question could only be described as bizarre and the initial call for assistance from a neighbor was that Decedent "seemed off." No criminal activity was reported. When the initial officer, Defendant TREAT, responded to the call, he observed a male and a female walking out from behind a

building and called over to them. The female started to walk to the patrol car and COFFMAN took off in the other direction. TREAT testified that Decedent called him a "fake cop" and ran from the officer and not towards him in any menacing or threatening way. There was no evidence before he was tased by TREAT that Decedent had hurt or threatened anyone, was committing a felony or had any weapon. It should be underscored that it was TREAT who first physically engaged COFFMAN and not the other way around.

131. Lisa DeMarco Edelston, whose name was supplied by Plaintiff during early discovery, had her deposition taken by defense counsel on July 21, 2021. She admitted to a history of drug and substance abuse disorders, including one felony conviction for possession on May 2, 2018, and a DUI conviction. Nonetheless, she managed to obtain a master's degree in community counseling at Webster University in March 2010.

132. In her deposition, Edelston testified that she had lived with COFFMAN (whom she referred to by his middle name, Jason) for a few months in 2018 just immediately prior to his death in July 2018. She is currently working in the restaurant business. She testified that she previously worked as an advisor on Baker acts for the Volusia County Sheriff when she worked at Stewart Marchman. She also holds a 2001 bachelor's degree in criminal justice from UCF. In her work for Stewart Marchman, she screened Baker act cases for two years and went to drug court for a

short period for her clients. She also worked at Aspire Healthcare as a screener as well for Baker act/Marchman act cases. In that position, she was involved in the direct provision of care to patients. Edelston testified that she had handled voluntary admissions, involuntary admissions, pre-diagnosis for the psychiatrist/psychologist, referrals, transfers, discharges, admissions, one-on-one therapy sessions, and group therapy.

133. Edelston testified that she was the female with COFFMAN when Defendant TREAT pulled up in his patrol car on June 28, 2018, the first officer to respond to the scene of a man who supposedly "seemed off," according to the caller. While TREAT cannot recall what if anything the female stated, he summoned both the male and female to the radio car and the man fled while the female remained. Edelston, however, had a clear recollection of her conversation and interaction with COFFMAN that morning, the encounter with an older former neighbor, and then Defendant TREAT.

134. Edelston testified that COFFMAN was not high on the morning of June 28, 2018 and had slept off any drugs he had previously taken, but that he was extremely paranoid about being chased or hounded by police. He had previously spoken to her about "suicide by cop" because he feared them so much. Edelston was attempting to calm him down as they were walking around the neighborhood. COFFMAN showed her where he had lived in that area as a child. Neither of them

tried to enter any home or disturb any of the neighbors. COFFMAN was then approached by an older man mowing his lawn who apparently knew Decedent's brother and asked "how was your brother doing?" COFFMAN knew the older man but just ran away because, as Edelston believed, he was embarrassed about his own agitated mental state.

135. Edelston saw Defendant TREAT pull over in his patrol car with his blue lights on. As soon as TREAT opened the vehicle door, Decedent ran across the street away from the officer saying, "they are not real cops." Edelston, fearing what might happen next, said to TREAT "he is schizophrenic. He needs to be Baker acted. He is out of his fucking mind." TREAT said to her "shut the fuck up and get back" and started chasing Decedent across the street. TREAT's body cam was not on, according to the video that she viewed. Obviously, TREAT did not appreciate the insight that Edelston, an individual with her own personal issues but nonetheless a professionally trained mental health counselor, had to offer. COFFMAN would soon be dead at the hands of four untrained police officers who were never at risk of serious injury and were ill informed regarding their agency's obligations under the ADA.

136. Had SDPD, on its own initiative or by CITY mandate, instituted a CIT program, which already had been in wide use in Florida since 2005, even line officers such as TREAT and MCCALLISTER would have recognized the mental

instability of the would-be offender and contacted CIT designated police officers. TREAT could have readily obtained the male's identity and his Baker act history from his female companion, who herself was professionally trained in Baker act criteria. Edelston futilely attempted to advise TREAT that her companion was schizophrenic and needed to be Baker acted. Instead, as already alleged, TREAT rudely told her to "shut the fuck up" and otherwise ignored her. Had a more enlightened and legally required ADA protocol been in place, the tragic outcome of COFFMAN's unnecessary death could have been most likely avoided.

137. With an obvious lack of understanding of the situation as it unfolded, Defendant TREAT pursued COFFMAN and was later assisted by three other Defendant officers, none of whom were trained in crisis intervention team procedures or apparently even aware of such procedures employed successfully by numerous other law enforcement agencies in Florida. COFFMAN was ultimately brought to the ground, handcuffed and placed in leg restraints, while Defendant MCCALLISTER continued to place his weight on the back and neck of Decedent COFFMAN while he, Decedent, was in a prone position for four (4) additional minutes, causing positional asphyxiation. According to a recent interview of the medical examiner, this can and did cause Decedent's death where he was unable to fully expand his lungs due to pressure on his back and eventually stopped breathing.

The medical examiner also expressed during the interview his belief that this type of dangerous restraint from untrained police officers often causes unnecessary death.

138. These operative and relevant facts regarding positional asphyxiation were conspicuously left off the supplemental report filed by each of the four individual Defendant officers. This is suggestive of a cover-up by the individual Defendant officers as to circumstances surrounding the actual cause of death of COFFMAN which was apparently knowingly tolerated, if not orchestrated, by the Municipal Defendants. CITY and SDPD officials at the highest level knowingly failed to make any meaningful inquiry into the strangulation of an unarmed and fully restrained individual, all of which affirmed their deliberate indifference to their agencies' obligations under the ADA.

139. To be entitled to compensatory damages under the ADA beyond simply injunctive relief, "a plaintiff must clear an additional hurdle: he must prove that the entity that he has sued engaged in intentional discrimination, which requires a showing of deliberate indifference." (Doc. 60, at 9) (citation omitted). As this Court correctly noted, this "requires proof that the defendant knew that harm to a federally protected right was substantially likely and… failed to act on that likelihood." (Doc. 60, at 10) (citation omitted). As this Court also correctly observed: "[I]n order to hold a government entity liable, the plaintiff must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute

corrective measures on the [entity's] behalf' had 'actual knowledge of discrimination in the [entity's] programs and fail[ed] adequately to respond.'" *Id.* (citations omitted).

140. It is respectfully believed by Plaintiff that these supplemental factual allegations in this Third Amended Complaint, derived from recent discovery and depositions, adequately allege knowledge by agency officials, with sufficient authority to rectify the situation, of such discrimination against mentally disabled individuals in violation of the ADA and the willful failure or deliberate indifference of such agency officials to remedy this discrimination. These well-pleaded allegations are sufficient to survive a motion to dismiss for failure to state a cause of action under the Rule 12(b)(6) standards announced by the United States Supreme Court in the *Ashcroft* and *Bell Atlantic Corp.* cases. (Doc. 60, at 3).

141. It is clear from the above identified allegations that both CITY and SDPD, acting through officials with sufficient authority, knowingly and/or with deliberate indifference violated Decedent COFFMAN'S federally guaranteed right to be free from discrimination on the basis of disability by failing to make reasonable modifications to its policies, practices and training procedures to ensure that his needs as an individual with a mental disability would be adequately met.

142. There is no question that COFFMAN qualifies as a disabled individual under the ADA based upon his mental disability which was widely known by the CITY and SDPD.

143. Title II of the ADA provides, in relevant part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject subjected to discrimination by any such entity." 42 U.S.C. §12132.

144. Title II of the ADA must be interpreted in a manner consistent with Section 504 of the Rehabilitation Act which specifies that "program or activity means *all* the operations of... a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. §794(b) (Emphasis added). That definition would encompass the operations of Defendants CITY and SDPD in its respective exercise of police powers, including the appropriate use of force by government officials acting under color of law.

145. The manifest and knowing failure of the CITY and SDPD to properly train their officers and/or properly staff the SDPD with qualified individuals dealing with citizens known to suffer from mental disabilities, such as Decedent COFFMAN, proximately caused the unnecessary death of Decedent who posed, at most, a non-lethal threat to the untrained officers. This tragic and unnecessary outcome was the result of COFFMAN's being discriminated against and excluded

from government services, including the lawful exercise of police powers, covered by both the ADA and the Rehabilitation Act and as required by the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) together with post judgment interest and costs and all damages contained in paragraph 47.

**COUNT XI**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**AGAINST CHIEF CHEATHAM**
**(In his official capacity)**

146. Plaintiff hereby incorporates by reference paragraphs 1-4, 11-47, 74-88, and 119-140 as though fully set forth herein.

147. It is clear from the above identified allegations that CHIEF CHEATHAM, in his official capacity (or his predecessors in their official capacity), knowingly violated decedent COFFMAN'S federally guaranteed right to be free from discrimination on the basis of disability by failing to make reasonable modifications to his policies, practices and training procedures to ensure that his needs as an individual with a mental disability would be adequately met.

148. There is no question that COFFMAN qualifies as a disabled individual under the ADA based upon his mental disability which was widely known by CHIEF CHEATHAM.

149. Title II of the ADA provides, in relevant part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject subjected to discrimination by any such entity." 42 U.S.C. §12132.

150. Title II of the ADA must be interpreted in a manner consistent with Section 504 of the Rehabilitation Act which specifies that "program or activity means *all* the operations of... a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. §794(b) (Emphasis added). That definition would encompass the operations of Defendant CHIEF CHEATHAM, in his official capacity, in his respective exercise of police powers, including the appropriate use of force by government officials acting under color of law.

151. The manifest and knowing failure of CHIEF CHEATHAM, in his official capacity, to properly train his officers and/or properly staff the SDPD with qualified individuals dealing with citizens known to suffer from mental disabilities, such as decedent COFFMAN, proximately caused the unnecessary death of decedent who posed, at most, a non-lethal threat to the untrained officers.

152. This tragic and unnecessary outcome was the result of COFFMAN's being discriminated against and excluded from government services, including the

lawful exercise of police powers, covered by both the ADA and the Rehabilitation Act and as required by the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Plaintiff Kimberly Mitchell demands damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) together with post judgment interest and costs and all damages contained in paragraph 47.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff KIMBERLY MITCHELL, individually and as Personal Representative of the Estate of TIMOTHY JASON COFFMAN, respectfully requests that this Court award the following damages, jointly and severally against Defendant MCCALLISTER, Defendant SANDERSON, Defendant TREAT and Defendant CRAIG, and Defendant CITY, and Defendant CHIEF CHEATHAM, in his official capacity, as provided by the Florida Wrongful Death Act and the United States Constitution, including but not limited to the following:

a) Award compensatory and any applicable punitive damages to Plaintiff;
b) Award costs of this action to Plaintiff;
c) Award reasonable attorneys' fees and costs to Plaintiff on Federal 1983 Counts pursuant to 42 U.S.C. §1988;
d) Loss of past and future support and services with interest;
e) Loss of earnings and net accumulations to the Estate of Timothy Coffman;

f)  Any and all medical and/or funeral expenses incurred due to the wrongful death of the Decedent;

g)  Loss to Plaintiff of familial relationship with decedent, companionship, comfort, support, society, care and sustenance of decedent, and the mental pain and suffering from the past date of injury through the future, compensation for medical bills as a result of psychological and physical injury, as a result of Timothy Coffman's death;

h)  Any and all other and further relief as this Court may deem appropriate.

## **TRIAL BY JURY**

WHEREFORE, Plaintiff KIMBERLY MITCHELL, as Personal Representative of the Estate of TIMOTHY JASON COFFMAN deceased, hereby demands a trial by jury on all issues so triable.

Dated this 4th day of October, 2021.

> Respectfully Submitted,
>
> */s/ Jason J. Recksiedler, Esq.*
>
> JASON J. RECKSIEDLER, ESQUIRE
> Florida Bar Number: 092060
> CAROLINE FISCHER ESPI, ESQUIRE
> Florida Bar Number:  1008358
> **First Choice Law, P.A.**
> 1137 Edgewater Dr.
> Orlando, Florida 32804
> Telephone:  321-999-1111
> Facsimile:  321-221-4262
> Jason@firstchoicelaw.com
> Caroline@firstchoicelaw.com
> Litigation@firstchoicelaw.com
> *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on October 4, 2021, I electronically filed the foregoing with

the Clerk of the Court using CM/ECF and a copy of the foregoing document is being

served this day to all counsel of record.

/s/ *Jason J. Recksiedler, Esq.*

JASON J. RECKSIEDLER, ESQUIRE
Florida Bar Number: 092060
CAROLINE FISCHER ESPI, ESQUIRE
Florida Bar Number:  1008358
**First Choice Law, P.A.**
1137 Edgewater Dr.
Orlando, Florida 32804
Telephone:  321-999-1111
Facsimile:   321-221-4262
Jason@firstchoicelaw.com
Caroline@firstchoicelaw.com
Litigation@firstchoicelaw.com
*Attorneys for Plaintiff*